1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

KEN RIDDLE,                                )
                                           )
              Plaintiff,                   )
                                           )                    2:07-cv-01127-RCJ -VCF
       v.                                  )
                                           )
DAVID WASHINGTON, et al.,                  )                    **ORDER**
                                           )
              Defendants.                  )
                                           )
_____    )

**I. Background**

**A. Factual Background**

Plaintiff is a white male who was terminated from his position as Deputy Fire Chief on July 20, 2006. (Riddle Decl. ¶ 13 (#24-2).)  Plaintiff began working for the City of Las Vegas Fire Department ("LVFD") in 1978. (Id. ¶ 1.)  The Chief of Fire and Rescue ("Fire Chief") is the top position within the fire department, and the next level of management consisted of Deputy Fire Chiefs, of which there were four at the time of Plaintiff's employment. (Id.)  Plaintiff was promoted to his position as Deputy Fire Chief in 1995.  (Id.)

David L. Washington ("Washington") was the former Fire Chief for the city of Las Vegas. (Washington Aff. ¶ 1 (#21-4).)  Washington was appointed Fire Chief on August 15, 2001, and retired on October 1, 2007.  (Id. ¶ 2.)  Washington was the Fire Chief at the time of Plaintiff's termination. (Id.)  Washington claims he encountered continuing problems with Plaintiff's behavior and job performance, such as routine disappearances and smoking in his office. (Id. ¶¶ 4-7.)  Washington claims that he had to speak with Plaintiff several times over the disappearances, smoking, and two separate incidents in 2003 and 2004 regarding the

1   misuse of credit cards belonging to professional associations.  (Id. ¶¶ 6-9.)

2       Plaintiff denies Washington's allegations that Plaintiff disappeared for long periods of
3   time, and claims that Washington never spoke to him about any such disappearances. (Riddle
4   Decl. ¶ 3 (#24-2).)

5       Washington states that city policy prohibits smoking in city buildings and in city vehicles.
6   (Washington Aff. ¶ 7 (#21-4).)  Washington claims that he received complaints that Plaintiff
7   was smoking in his office starting in May 2002, and that he met with him four times over the
8   next two years regarding the complaints.  (Id.)  Washington claims Plaintiff denied smoking
9   in his office each time the matter was discussed. (Id.)

10      Washington claims that due to further complaints made in September 2004 about
11  Plaintiff smoking in his office, he had to speak with Plaintiff for a fifth time regarding the issue.
12  (Id. ¶ 12 (#21-4).)  Washington states that before Plaintiff could deny that he was smoking in
13  his office, Washington told Plaintiff that several individuals had told him that Plaintiff was in
14  fact smoking in the office, and Plaintiff finally admitted to having a problem and stated that he
15  would seek help.  (Id.)  Washington told him that smoking in the office was the problem, not
16  smoking itself.  (Id.) Plaintiff claims that while he previously smoked in his office, he quit
17  smoking in the office when Washington made a passing comment in 2004. (Riddle Decl. ¶ 5
18  (#24-2).)  Plaintiff denies that Washington had several discussions over a two-year period
19  about smoking in the office.  (Id.)

20      Washington learned in 2003 that Plaintiff had been using the credit card of the
21  Emergency Medical Services of the International Association of Fire Chiefs for personal use.
22  (Washington Aff. ¶ 8 (#21-4).) Plaintiff was reprimanded, and city management was informed.
23  (Id.) Plaintiff claims that he mistakenly used this credit card, discovered his error, and paid the
24  association. (Riddle Decl. ¶ 7 (#24-2).)  Plaintiff denies that he was ever reprimanded for this
25  issue.  (Id.)

26      In April 2004, Washington learned that Plaintiff had "repeatedly" misused a credit card
27  of the Southern Nevada Fire Chiefs Association at local casinos. (Washington Aff. ¶ 9 (#21-
28  4).) At that time, Washington claims that the City Manager's office recommended that Plaintiff

be terminated, but Washington obtained approval of a plan that docked Plaintiff 120 hours of annual leave, disallowed travel or training, denied the payment of any professional association dues for 2005, required surrender of any association credit cards, denied consideration of bonuses or salary increases for 2005, and required Plaintiff to join Gamblers Anonymous and report to Washington of his attendance. (Id.) Washington claims that Plaintiff admitted to not attending the Gamblers Anonymous meetings as required, but that Washington later granted him permission to attend half the meetings online. (Id. ¶¶ 10-11.)

Plaintiff claims that in 2004, he again mistakenly used the card, thinking it was his own, discovered the error and immediately paid the association. (Riddle Decl. ¶ 8 (#24-2).) Plaintiff agrees that Washington reprimanded him for the 2004 incident and that certain restrictions were placed on him at that time as a disciplinary measure. (Id.) Plaintiff states that he finished the required time frame of Gamblers Anonymous after being granted permission to attend online. (Id. ¶ 9.)

In 2005, Washington observed Plaintiff inebriated at a reception for the New Orleans Furloughed Police, Firefighters and EMS personnel. (Washington Aff. ¶ 13 (#21-4).) Plaintiff admits to being inebriated and points out that the reception was held off premises and did not occur during work hours. (Riddle Decl. ¶ 10 (#24-2).)

Washington received an email on November 28, 2005 from a city employee claiming that Plaintiff was smoking in his city vehicle. ((Washington Aff. ¶¶ 14-15 (#21-4).) ) After the first complaint in November 2005, Washington met with Plaintiff who did not deny the allegations, according to Washington. (Id. ¶ 14.) On December 14, 2005, Plaintiff was suspended and his take home vehicle was taken away. (Id.)

In July 2006, the same city employee who had complained the first time sent another email claiming that Plaintiff was smoking in his city vehicle. (Id. ¶ 15.) Washington claims that he terminated Plaintiff at this time due to Plaintiff's "repeated violations of city policy" and repeated lies over a four-year period. (Id. ¶ 16.) Washington claims he "lost all trust in Riddle and felt [he] could no longer tolerate him as a member of [his] senior staff." (Id.)

1    Plaintiff admits that he formerly smoked in his city vehicle, a vehicle assigned to him

2  twenty-four hours a day, seven days a week. (Riddle Decl. ¶ 4, 6 (#24-2).) Plaintiff claims that

3  Washington never complained about Plaintiff's smoking in his vehicle until after Washington

4  announced his intention to retire within the next one to two years. (Id. ¶ 6.) Plaintiff claims

5  that after announcing retirement plans, Washington began a campaign of enforcing the city

6  rules concerning smoking. (Id.) Plaintiff states that in July 2006 he was not smoking in his

7  vehicle as he had taken a course and had stopped smoking at that time. (Id.)

8    Plaintiff also states that in June 2006 he received an excellent review (a 7.5 out of 10)

9  from Washington and received a merit pay increase. (Id. ¶ 11; June 2006 Performance

10  Evaluation (#24-3).) Plaintiff received numerous merit increases in pay between 2001 and

11  2006. (Performance Evaluations (#24-3).) Plaintiff claims that he also received a good

12  performance review by Washington in 2005, but both reviews from 2005 and 2006 are missing

13  from his personnel file. (Id.)

14    Plaintiff was replaced by an African-American named Gene Campbell. (Id. ¶ 12.)

15  Campbell had been appointed an assistant chief in 2001 by Washington. (Id.) At the time of

16  Plaintiff's termination, section 3.210 of the City Charter indicated that any appointive position

17  such as Plaintiff's was only subject to termination if ratified by the City Council. (City Charter,

18  Ex. 3 (#24-5).) When Plaintiff inquired as to whether the City Council had voted on his

19  termination, nobody explained why there had been no vote. (Riddle Decl. ¶ 14 (#24-2).)

20  Plaintiff later learned that after that meeting, the City revoked section 3.210. (Id.)

21    Plaintiff claims that Washington treated Plaintiff differently from African-American

22  individuals, restricting his duties, administrative days off, and administrative leave. (Id. ¶ 15.)

23  Plaintiff claims Washington also made various race-related remarks and claimed to be "pro

24  black." (Id. ¶¶ 16-17.) Plaintiff states that Washington showed preferential treatment in many

25  ways towards African-American coworkers and potential hires. (Id. ¶¶ 16, 18.) Plaintiff heard

26  Washington comment that Campbell would be a fire chief someday. (Id. ¶ 19.) During a

27  deposition, Dean W. Fletcher, a fire captain with the LVFD, testified that he believed

28  Washington wanted to get rid of Plaintiff in order to promote Gene Campbell. (Fletcher Dep.

4

at 15 (#24-9).)  Fletcher also testified that Washington put Campbell into positions that would make Campbell "look more important and build[] a resume that he was over more people and doing more things."  (Id. at 10.)

Plaintiff also claims that Washington made a defamatory statement about Plaintiff on June 11, 2007.  On that date, Washington sent a letter addressed to Jim Harmes, the President of the International Association of Fire Chiefs, stating that:

> The issue I have is the way members of Las Vegas Fire & Rescue were disrespected and mistreated.  That occurred when our members asked to be allowed to enter the conference free as we had been allowed to in previous years. They were told they could not be helped by the consultant you all contracted with to run the conference.

(Washington Letter to Harmes, Ex. 1 (#3-2).)  Plaintiff alleges in his complaint (#3) that Harmes knew the letter referred to Plaintiff, and the statement was defamatory.

**B. Procedural Background**

On August 22, 2007, Plaintiff filed his complaint (#1) against the City of Las Vegas and David Washington.  (Compl. (#1).)  On August 31, 2007, Plaintiff filed an Amended Complaint (#3), bringing claims under (1) Title VII against the LVFD; (2) 42 U.S.C. § 1983 against Washington for wrongful termination; (3) 42 U.S.C. § 1983 regarding the termination of Plaintiff's employment based upon equal protection against Defendant City of Las Vegas; (4) 42 U.S.C. § 1981 against Washington and the City of Las Vegas; (5) Nev. Rev. Stat. § 613.333 for unlawful employment practices; and (6) defamation.  The § 1981 claim is brought as an alternative to § 1983 only in the case that Washington is found not to have been acting under color of state law.

On February 4, 2010, Defendants filed a Motion for Summary Judgment (#21).  On March 5, 2010, Plaintiff filed his opposition (#24).  On April 5, 2010, Defendants filed their reply (#27).  On April 23, 2010, the Court granted (#28) the Motion for Summary Judgment (#21).  The Court found that Plaintiff met his burden of establishing a prima facie case of discrimination, Defendants met their burden of production to show a legitimate non-

1   discriminatory reason for termination, but Plaintiff failed to raise a triable issue of fact with
2   respect to whether Plaintiff was terminated for a discriminatory reason.  The Court declined
3   to exercise supplemental jurisdiction over Plaintiff's remaining state law claims because the
4   federal claims had been dismissed. Plaintiff appealed (#30).

5       On October 21, 2011, the Ninth Circuit reversed and remanded (#34), finding that
6   Washington's promotion of Campbell to replace Plaintiff although another employee viewed
7   Campbell as knowing nothing about areas in which he had previously been promoted, the
8   written documentation of Plaintiff's job performance, and the materially disputed aspects of
9   his performance provide a sufficient basis for a reasonable juror to find that Defendants'
10  reasons for Plaintiff's termination are pretext.  The Ninth Circuit also remanded the action for
11  the Court to consider whether it should exercise supplemental jurisdiction over Plaintiff's state
12  law claims for wrongful termination and defamation.

### II. Legal Standard

13
14      Summary judgment allows courts to avoid unnecessary trials where no material factual
15  dispute exists.  N.W. Motorcycle Ass'n v. U.S. Dep't of Agric., 18 F.3d 1468, 1471 (9th Cir.
16  1994).  The court must view the evidence and the inferences arising therefrom in the light most
17  favorable to the nonmoving party, Bagdadi v. Nazar, 84 F.3d 1194, 1197 (9th Cir. 1996), and
18  should award summary judgment where no genuine issues of material fact remain in dispute
19  and the moving party is entitled to judgment as a matter of law.  FED. R. CIV. P. 56(c).
20  Judgment as a matter of law is appropriate where there is no legally sufficient evidentiary basis
21  for a reasonable jury to find for the nonmoving party.  FED. R. CIV. P. 50(a).  Where reasonable
22  minds could differ on the material facts at issue, however, summary judgment should not be
23  granted.  Warren v. City of Carlsbad, 58 F.3d 439, 441 (9th Cir. 1995), cert. denied, 516 U.S.
24  1171(1996).

25      The moving party bears the burden of informing the court of the basis for its motion,
26  together with evidence demonstrating the absence of any genuine issue of material fact.
27  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  Once the moving party has met its burden,
28  the party opposing the motion may not rest upon mere allegations or denials in the pleadings,

1   but must set forth specific facts showing that there exists a genuine issue for trial.  Anderson

2   v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  Although the parties may submit evidence

3   in an inadmissible form — namely, depositions, admissions, interrogatory answers, and

4   affidavits — only evidence which might be admissible at trial may be considered by a trial court

5   in ruling on a motion for summary judgment.  FED. R. CIV. P. 56(c); Beyene v. Coleman Sec.

6   Servs., Inc., 854 F.2d 1179, 1181 (9th Cir. 1988).

7        In deciding whether to grant summary judgment, a court must take three necessary

8   steps: (1) it must determine whether a fact is material; (2) it must determine whether there

9   exists a genuine issue for the trier of fact, as determined by the documents submitted to the

10   court; and (3) it must consider that evidence in light of the appropriate standard of proof.

11   Anderson, 477 U.S. at 248.  Summary judgment is not proper if material factual issues exist

12   for trial.  B.C. v. Plumas Unified Sch. Dist., 192 F.3d 1260, 1264 (9th Cir. 1999).  "As to

13   materiality, only disputes over facts that might affect the outcome of the suit under the

14   governing law will properly preclude the entry of summary judgment."  Anderson, 477 U.S. at

15   248.  Disputes over irrelevant or unnecessary facts should not be considered.  Id.  Where

16   there is a complete failure of proof on an essential element of the nonmoving party's case, all

17   other facts become immaterial, and the moving party is entitled to judgment as a matter of law.

18   Celotex, 477 U.S. at 323.  Summary judgment is not a disfavored procedural shortcut, but

19   rather an integral part of the federal rules as a whole.  Id.

### III. Discussion

### A. Unfair Employment Practices in Violation of Nev. Rev. Stat. § 613.333

22        Nevada law provides that it is an unlawful employment practice for an employer to

23   discharge or otherwise discriminate against any employee concerning the employee's

24   compensation, terms, conditions or privileges of employment "because the employee engages

25   in the lawful use in this state of any product outside the premises of the employer during the

26   employee's nonworking hours, if that use does not adversely affect the employee's ability to

27   perform his or her job or the safety of other employees." NEV. REV. STAT. § 613.333.

28

7

1
2
3
4
5
6
7
8

Plaintiff's complaint alleges that "his use of cigarettes outside the premises of the LVFD was a factor in having his employment terminated." (Am. Compl. ¶ 35 (#3).)  Plaintiff states in his declaration that he was assigned "an unmarked City vehicle" that was in his care, custody, and control twenty-four hours a day, seven days a week. (Riddle Decl. ¶ 5 (#24-2).)  Plaintiff admits to smoking in his city vehicle while traveling to and from work. (Id. ¶ 6.) Plaintiff claims that at the time of his termination, allegedly for smoking in his city vehicle and for prior violations of city policy, Plaintiff had not been smoking in his vehicle as he had quit smoking at that time. (Id.)

9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

The City of Las Vegas's tobacco policy provides that "[c]ity vehicles, including rental cars used for City business, shall be tobacco-free." (City Tobacco Policy Ex. D (#21-5).)  The policy provides that Nevada State Law prohibits the smoking of tobacco in public buildings, and the City of Las Vegas enforces a stricter policy by prohibiting tobacco near its buildings as well as in city vehicles.  (Id.)  Nev. Rev. Stat. § 613.333 prohibits discharging or otherwise discriminating against any employee for the lawful use of any product "outside the premises of the employer during the employee's nonworking hours."  While no cases have interpreted § 613.333 in Nevada, the Eighth Circuit noted that an analogous Minnesota statute does not prohibit an employer from discharging an employee for driving a company vehicle while under the influence of alcohol.  Miners v. Cargill Comms, Inc.,113 F.3d 820, 824 (8th Cir. 1997).  While Plaintiff disputes whether his termination was truly for violating city policy, and also disputes smoking in his vehicle at the time of his termination, we find that the City may legitimately prohibit its employees from smoking in city vehicles without running afoul of § 613.333.  Therefore, summary judgment is appropriate for Plaintiff's claim alleging a violation of Nev. Rev. Stat. § 613.333.

24

**B. Defamation**

25
26
27
28

Plaintiff's defamation claim, as alleged in the amended complaint (#3), is based on a letter (Washington Letter to Harmes, Ex. 1 (#3-2)) Washington wrote to a third party stating that an anonymous person disrespected and mistreated members of the LVFD.  Plaintiff claims that the recipient of the letter understood it to be referring to Plaintiff as the party who

allegedly disrespected and mistreated members of the LVFD.  (Am. Compl. ¶ 41 (#3).) The letter was attached as Exhibit 1 to the Amended Complaint and states only that:

> The issue I have is the way members of Las Vegas Fire & Rescue were disrespected and mistreated. That occurred when our members asked to be allowed to enter the conference free as we had been allowed to in previous years. They were told they could not be helped by the consultant you all contracted with to run the conference.

(Washington Letter to Harmes, Ex. 1 (#3-2).)  This is the extent of the alleged defamatory statement. Plaintiff's complaint (#3) alleges that this letter constitutes defamation per se, and Plaintiff has suffered damages as a result of the letter's publication to Harmes. Defendants argue that a "mere complaint" and a statement of opinion cannot be considered defamatory. (Mot. Summ. J. at 8 (#21).)

An action for defamation in Nevada requires the plaintiff to prove (1) a false and defamatory statement; (2) an unprivileged publication to a third person; (3) fault, amounting to at least negligence; and (4) actual or presumed damages. Clark Cnty. Sch. Distr. v. Virtual Educ. Software, Inc., 213 P.3d 496, 503 (Nev. 2009).  "Certain classes of defamatory statements are, however, considered defamatory per se and actionable without proof of damages." Pope v. Motel 6, 114 P.3d 277, 282 (Nev. 2005).  The four types of statements historically designated as defamatory per se are false statements made involving: "(1) imputations that plaintiff has committed a crime; (2) imputations that would injure plaintiff's trade, business or office; (3) imputations that the plaintiff has contracted a loathsome disease; and . . . (4) imputations of unchastity in a woman." Branda v. Sanford, 637 P.2d 122, 1225 (Nev. 1981).

Plaintiff's contention that Washington's letter constitutes defamation per se is without merit.  The statements contained in the letter do not fall under the traditional categories for which Nevada recognizes defamation per se.  Nor is there a genuine issue of material fact that the letter could be considered defamatory.  Statements are defamatory "only if they are presented as fact rather than opinion, and only if the facts asserted are false." Wellman v. Fox, 825 P.2d 208, 210 (Nev. 1992).  The statement objected to as defamatory is Washington's reference to the way members of Las Vegas Fire & Rescue were disrespected

and mistreated.  This statement, taken by itself, is a statement of opinion.  Plaintiff does not object to the remainder of the letter, in which Washington explains that he felt members of Las Vegas Fire & Rescue were disrespected and mistreated when prohibited from entering a conference free of charge by being told that they could not be helped.  We conclude that a reasonable juror could not find that the above statement is defamatory, and summary judgment is appropriate.

### IV. Conclusion

IT IS ORDERED that summary judgment is granted on Plaintiff's fifth cause of action for violation of Nev. Rev. Stat. § 613.333 and on Plaintiff's sixth cause of action for defamation.

DATED: This 1st day of August, 2012.

_____
United States District Judge